FILED

JUL - 6 2004

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**JAMIL EL-BANNA,**
**Detainee, Camp Delta;**
Guantanamo, Cuba
**SABAH SUNNRQROUT,**
**as Next Friend of Jamil El-Banna;**

**BISHER AL-RAWI,**
**Detainee, Camp Delta; and**
Guantanamo, Cuba
**JAHIDA SAYYADI,**
**as Next Friend of Bisher Al-Rawi,**

***Petitioners,***

**v.**

**GEORGE W. BUSH,**
**President of the United States**
**The White House**
**1600 Pennsylvania Ave., N.W.**
**Washington, D.C. 20500;**

**DONALD RUMSFELD,**
**Secretary, United States**
**Department of Defense**
**1000 Defense Pentagon**
**Washington, D.C. 20301-1000;**

**ARMY BRIG. GEN. JAY HOOD,**
**Commander, Joint Task Force - GTMO**
**Guantánamo Bay Naval Station**
**Guantánamo Bay, Cuba; and**

**ARMY COL. NELSON J. CANNON,**
**Commander, Camp Delta,**
**Guantánamo Bay Naval Station**
**Guantánamo Bay, Cuba,**

***Respondents.***

**PETITION FOR WRIT OF *HABEAS CORPUS***

**No.**

CASE NUMBER 1:04CV01144

JUDGE: Richard W. Roberts

DECK TYPE: Habeas Corpus/2255

DATE STAMP: 07/6/2004

**PETITION FOR WRIT OF *HABEAS CORPUS***

1. Petitioners Bisher Al-Rawi ("Al-Rawi") and Jamil El-Banna ("El-Banna") seek the Great Writ. They act on their own behalf and through their Next Friends, Ms. Jahida Sayyadi, the mother of Bisher Al-Rawi, and Ms. Sabah Sunnrqrout, the wife of Jamil El-Banna.

2. Petitioner Al-Rawi is an Iraqi citizen and a permanent resident of the United Kingdom. Petitioner El-Banna is Palestinian and a permanent resident of the United Kingdom. Petitioners Al-Rawi and El-Banna (the "detained Petitioners") are being held virtually *incommunicado* in Respondents' unlawful custody at Camp Delta, Guantánamo.

3. Pursuant to the President's authority as Commander-in-Chief and/or under the laws and usages of war and/or the November 13, 2001 Military Order, Respondents George W. Bush, President of the United States, Donald H. Rumsfeld, U.S. Secretary of Defense, Army Brigadier General Jay Hood, Commander of Joint Task Force-GTMO, and Army Colonel Nelson J. Cannon, Commander, Camp Delta, Guantánamo Bay Naval Station, Cuba, are either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of the detained Petitioners at Guantánamo.

## I.
## JURISDICTION

4. Petitioners bring this action under 28 U.S.C. §§ 2241 and 2242, and invoke this Court's jurisdiction under 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; as well as the Fifth, Sixth, and Eighth Amendments to the United States Constitution; the International Covenant on Civil and Political Rights; the American Declaration on the Rights and Duties of Man; and customary international law. Because they seek declaratory relief, Petitioners also rely on Fed. R. Civ. P. 57.

5. This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus, and to entertain the Petition filed by Sabah Sunnrqrout and Jahida Sayyadi as Next Friends under 28 U.S.C. § 2242. This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy

within the Court's jurisdiction.

## II.
## PARTIES

6. Petitioner Bisher Al-Rawi is an Iraqi citizen and a permanent resident of the United Kingdom who is presently incarcerated and held in Respondents' unlawful custody at Camp Delta, Guantánamo. *See* Exhibit A at ¶ 2. Affidavit of Jahida Sayyadi and attachments exhibited thereto ("Sayyadi Affidavit"), incorporated by reference herein.

7. Petitioner Jahida Sayyadi is Petitioner Al-Rawi's mother. She is a British citizen. Because her son has been denied access to legal counsel and to the courts of the United States, Jahida Sayyadi acts as his Next Friend. *See* Sayyadi Affidavit, Exhibit A, at ¶ 7. On her own and through British Counsel, Gareth Peirce ("British Counsel"), Jahida Sayyadi has tried repeatedly to contact her son, to learn more about his condition and status and to gain access to him. British authorities have rebuffed or ignored Ms. Sayyadi's and British Counsel's requests. *See id.* at ¶ 5, 6. The United States has refused to provide any information to Ms. Sayyadi or to British Counsel regarding the date and circumstances of Petitioner Al-Rawi's arrest or the specific reasons for his continued detention at Guantánamo. *See* Exhibit B, Affidavit of Gareth Peirce, British Counsel for Petitioner Al-Rawi ("Peirce Al-Rawi Affidavit"); Sayyadi Affidavit, Exhibit A, at ¶ 5, 6.

8. Petitioner Jamil El-Banna is a Palestinian and a permanent resident of the United Kingdom who is presently incarcerated and held in Respondents' unlawful custody at Camp Delta, Guantánamo. *See* Exhibit C at ¶ 7, Affidavit of Sabah Sunnrqrout and attachments exhibited thereto ("Sunnrqrout Affidavit"), incorporated by reference herein. Petitioner Sabah Sunnrqrout is Petitioner El Banna's wife. Because her husband cannot secure access either to legal counsel or to the courts of the United States, Sabah Sunnrqrout acts as his Next Friend. *See* Sunnrqrout Affidavit, Exhibit C, at ¶ 8. Through British Counsel, Sabah Sunnrqrout has tried repeatedly to contact her husband, to learn more about his condition and status and to gain access to him. Both the U.S. and the British Authorities have rebuffed or ignored counsel's requests. *See* Exhibit D at ¶¶ 17-27, Affidavit of Gareth Peirce, British Counsel for Petitioners El-Banna and Sabah Sunnrqrout, and attachments exhibited thereto ("Peirce El-Banna

Affidavit"), incorporated by reference; Sunnrqrout Affidavit, Exhibit C, at ¶¶ 4, 7 & 8. The United States has provided no information either to Ms. Sunnrqrout or to British Counsel regarding the date and circumstances of Petitioner El-Banna's arrest or the specific reasons for his continued detention at Guantánamo. *See* Sunnrqrout Affidavit, Exhibit C, at ¶ 4.

9. Respondent George W. Bush ("President Bush") is the President of the United States and Commander-in-Chief of the United States Military. Petitioner's El-Banna and Mr. Al-Rawi are being detained pursuant to President Bush's authority as Commander-in-Chief and under the laws and usages of war or, alternatively, pursuant to the Executive Order. Accordingly, Respondent Bush is responsible for Petitioners' unlawful detention. He is sued in his official capacity.

10. Respondent Donald Rumsfeld ("Respondent Rumsfeld") is the Secretary of the United States Department of Defense. Pursuant to either the November 13, 2001 Military Order or the President's authority as Commander-in-Chief and under the laws and usages of war, Respondent Rumsfeld has been charged with maintaining the custody and control of the detained Petitioners. He is sued in his official capacity.

11. Respondent Brigadier Gen. Jay Hood ("Respondent Hood") is the Commander of Joint Task Force-GTMO, the task force running the detention operation at Guantánamo. He has supervisory responsibility for the detained Petitioners and is sued in his official and individual capacities.

12. Respondent Col. Nelson J. Cannon is the Commander of Camp Delta, the U.S. facility where the detained Petitioners are presently held. He is the immediate custodian responsible for their detention, and is sued in his official and individual capacities.

## III.
## STATEMENT OF FACTS

13. The detained Petitioners are not, nor have they ever been, enemy aliens, lawful or unlawful belligerents, or combatants of any kind.

14. The detained Petitioners are not, nor have they ever been, "enemy combatants" who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who

were engaged in an armed conflict against the United States there." *See Hamdi v. Rumsfeld*, 542 U.S. __, slip op. at 8-9 (June 28, 2004).

15. Petitioners seek to enforce their right to a judicial determination that there is a factual basis for Respondent's determination that they are "enemy combatants."

16. The Republic of The Gambia is a republic located in West Africa, surrounded by Senegal on three sides and the Atlantic Ocean. The Gambia was colonized by Britain and gained its independence on February 18, 1965. The Gambia is a member of the British Commonwealth of Nations. The Gambia's most recent elections were deemed free and fair by international observers. Extradition from The Gambia to the United States is controlled by the Extradition Treaty between the United States and the United Kingdom signed on December 22, 1931. The Gambia and the United States are at peace.

17. On or about November 8, 2002, Petitioner Al-Rawi departed the U.K. for The Gambia in order to meet his brother and commence work on a joint business project involving the establishment of a peanut oil processing plant there. *See* Sayyadi Affidavit, Exhibit A, at ¶ 4. The project had received approval from the Gambian government and had been registered with Gambian authorities. Accompanying him was Petitioner El-Banna and another two colleagues involved in the same business project. After arriving at Banjul Airport in The Gambia, the three travellers and Petitioner Al-Rawi's brother, Wahab, who was present to meet them, all were detained by the Gambian authorities. The four men were initially questioned by the Gambian National Intelligence Agency and later, on information and belief, by representatives of the United States (either the Central Intelligence Agency or military intelligence). On information and belief, the interrogation of petitioners involved "stress and duress" techniques at the direction of the representatives of the United States and in violation of international law. After being detained for nearly a month, two of the four men, each of whom had a British passport, were released but Petitioners Al-Rawi and El-Banna remained in Gambian detention. *See* Peirce Al-Rawi Affidavit, Exhibit B, at ¶ 5.

18. In early 2003, British Counsel for Petitioners was advised that Petitioners Al-Rawi and El-Banna had been secretly transferred from The Gambia to the U.S. Air Force Base in Bagram,

Afghanistan. *See* Peirce Al-Rawi Affidavit, Exhibit B, at ¶ 23. On information and belief, Petitioners were transferred from The Gambia to Afghanistan in custody of the United States. Their transfer took place while a *habeas corpus* petition filed on their behalf was pending before the courts in the United Kingdom.

19. Some time in 2003, Petitioner Al-Rawi's family was made aware that he had been transferred to Guantánamo along with Petitioner El-Banna. *See id* at ¶ 24. Petitioners have been held in U.S. custody at Guantánamo since that time.

20. At the time of his detention, Petitioner Al-Rawi was not a member of either the Taliban government's armed forces or the Al Qaeda armed forces. He did not cause or attempt to cause any harm to American personnel or property prior to his detention. Petitioner Al-Rawi was not in Afghanistan at the time of his detention. He was taken into custody in The Gambia, turned over to the custody of the U.S. Military there, transported illegally to Afghanistan, and thereafter illegally transported to and incarcerated at the U.S. Military base at Guantánamo, Cuba, a territory over which the United States exercises exclusive jurisdiction and control.

21. On November 8, 2002, Petitioner El-Banna departed the U.K. for The Gambia in order to meet several business associates regarding the establishment of a peanut oil processing factory there. Accompanying him were Petitioner Al-Rawi and Abdullah El Janoudi, both of whom were involved in the same business project. Upon his arrival in Gambia, Petitioner El-Banna and his three business associates, including Wahab Al-Rawi, who was present to meet them, all were detained by Gambian authorities. *See* Sunnrqrout Affidavit, Exhibit C, at ¶ 4; Peirce El-Banna Affidavit, Exhibit D, at ¶ 5. After being detained for nearly a month, Wahab Al-Rawi and another business associate, both British citizens, were released; Petitioner El-Banna, however, remained in detention in The Gambia along with one of his business associates, Petitioner Al-Rawi. *See* Peirce El-Banna Affidavit, Exhibit D, at ¶ 5.

22. In early 2003, British Counsel for Petitioners was advised that the detained Petitioners had been secretly transferred from The Gambia to the U.S. Air Force Base in Bagram, Afghanistan. *See* Peirce El-Banna Affidavit, Exhibit D, at ¶ 23. Some time in 2003, Petitioner El-Banna's family was made aware that he had been transferred to Guantánamo. *See* Sunnrqrout Affidavit,

Exhibit C, at ¶ 4. Petitioner El-Banna has been held in U.S. custody at Guantánamo since that time. *See* Peirce El-Banna Affidavit, Exhibit D, at ¶ 24.

23. At the time of his detention, Petitioner El-Banna was not a member of either the Taliban government armed forces or the Al Qaeda armed forces. He did not cause or attempt to cause any harm to American personnel or property prior to his capture. Mr. El-Banna was not in Afghanistan at the time of his detention, but was taken into custody in The Gambia, turned over to the custody of the U.S. Military there, illegally transported to and incarcerated at the U.S. Military base at Guantánamo, Cuba, a territory over which the United States exercises exclusive jurisdiction and control.

**The Joint Resolution**

24. In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of Respondent Bush, began a massive military campaign against the Taliban government, then in power in Afghanistan. On September 18, 2001, a Joint Resolution of Congress authorized President Bush to use force against the "nations, organizations, or persons" that "planned, authorized, committed, or aided the terrorist attacks on September 11, 2001, or [that] harbored such organizations or persons." Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Jan. 18, 2001).

25. The detained Petitioners are not, and have never been, members of Al Qaeda or any other terrorist group. Prior to their detention, they did not commit any violent act against any American person or espouse any violent act against any American person or property. Nor were they involved in the ensuing armed conflict. They had no involvement, direct or indirect, in either the terrorist attacks on the United States on September 11, 2001, or any act of international terrorism attributed by the United States to Al Qaeda or any other terrorist group. They are not properly subject to the detention order issued by President Bush. As they did not participate in the armed conflict at any point in time, they are not properly subject to President Bush's authority as Commander-in-Chief or under the laws and usages of war.

26. The detained Petitioners have had no military or terrorist training. They have never been affiliated with or members of any terrorist organization. They have never engaged in combat

against American forces.

27. The detained Petitioners were not initially taken into custody by American forces. They were taken into custody against their will by Gambian authorities and handed over to the Americans.

28. The detained Petitioners promptly identified themselves by their correct names and nationality to the United States. They requested that the United States provide them with access to their families and to legal counsel. The detained Petitioners were kept blindfolded against their will for lengthy periods while being transported involuntarily and illegally first to Afghanistan and then to Guantánamo. The detained Petitioners believe they were transported to Guantánamo through American territory.

**The Detention Order**

29. On November 13, 2001, Respondent Bush issued an Executive Order authorizing Respondent Rumsfeld to detain indefinitely anyone Respondent Bush has "reason to believe":

> i. is or was a member of the organization known as al Qaeda;
>
> ii. has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or
>
> iii. has knowingly harbored one or more individuals described in subparagraphs (i) and (ii).

*See* Executive Order of November 13, 2001 ("Military Order"). President Bush must make this determination in writing. The Order was neither authorized nor directed by Congress, and is beyond the scope of the Joint Resolution of September 18, 2001.

30. The Executive Order vests President Bush with complete discretion to identify individuals who fall within its purview. It establishes no standards governing the exercise of his discretion. Once a person has been detained, the Order contains no provision for that person to be notified of the charges he may face. The Order authorizes detainees to be held without charges. It contains no provision for a detainee to be notified of his rights under domestic and international

law, and provides neither the right to counsel, nor the right to consular access. It provides no right to appear before a neutral tribunal to review the legality of a detainee's continued detention and no provision for appeal to an Article III court. In fact, the Order expressly bars review by any court. The Order authorizes indefinite and unreviewable detention, based on nothing more than the President Bush's written determination that an individual is subject to its terms.

31. The Executive Order was promulgated in the United States and in this judicial district, the decision to incarcerate the detained Petitioners was made by Respondents in the United States and in this judicial district, the decision to detain Petitioners at Guantánamo was made in the United States and in this judicial district, and the decision to continue detaining the Petitioners was, and is, being made by Respondents in the United States and in this judicial district.

32. President Bush has never certified or determined in any manner, in writing or otherwise, that the detained Petitioners are subject to the Executive Order.

33. The detained Petitioners are not properly subject to the Executive Order.

34. The petitioners are not being detained lawfully pursuant to President Bush's authority as Commander-in-Chief or under the laws and usages of war. The detained Petitioners were not arrested or detained by the United States in the course of an armed conflict.

35. The detained Petitioners were arrested in The Gambia and detained by Gambian authorities not by United States authorities. They were not arrested in Afghanistan and were taken there illegally and against their will while a *habeas corpus* petition was pending in the United Kingdom. Accordingly, Petitioners are not properly detained under the President Bush's authority as Commander-in-Chief or under the laws and usages of war.

**Guantánamo Bay Naval Station**

36. On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba. In April 2002, all prisoners were transferred to a more permanent prison facility in Guantánamo, Camp Delta. Offenses committed by both civilians and foreign nationals living on Guantánamo are brought before federal courts on the mainland, where respondents enjoy the

full panoply of Constitutional rights. Detainees incarcerated at Guantánamo are entitled to test the legality of their detention in the federal courts. *Rasul v. Bush*, 542 U.S. ___, (June 28, 2004).

37. In or about the spring of 2003, the precise date being unknown to counsel but known to Respondents, the United States military transferred the detained Petitioners to Guantánamo, where they have been held ever since, in the custody of President Bush and Respondents Rumsfeld, Hood, and Cannon.

**The Conditions of Detention at Guantánamo**

38. Since gaining control of the detained Petitioners, the United States military has held them virtually *incommunicado*. On information and belief, they have been or will be interrogated repeatedly by agents of the United States Departments of Defense and Justice, and the Central Intelligence Agency, though they have not been charged with an offense, nor have they been notified of any pending or contemplated charges. They have made no appearance before either a military or civilian tribunal of any sort, nor have they been provided counsel or the means to contact counsel. They have not been informed of their rights under the United States Constitution, the regulations of the United States Military, the Geneva Convention, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, or customary international law. Indeed, Respondents have taken the position that the detained Petitioners should not be informed of these rights. As a result, the detained Petitioners lack any ability to protect or to vindicate their rights under domestic and international law.

39. On information and belief, the detained Petitioners have been forced to provide involuntary statements to Respondents' agents at Guantánamo. The detained Petitioners have been held under conditions that violate their international and constitutional rights to dignity and freedom from cruel, unusual and degrading treatment or punishment. They have been housed throughout their detention in a manner that fails to satisfy both domestic and internationally accepted standards of accommodations for any person subject to detention. They were initially forced to use a bucket for a toilet, and were not provided with basic hygienic facilities. They have been

denied any meaningful access to their families. They have not been provided with the opportunity to exercise fully their religious beliefs. They have been exposed to the indignity and humiliation of the cameras of the national and international press, which were brought to Guantánamo with the express consent and control of Respondents.

40. In published statements, President Bush and Respondent Rumsfeld, Brigadier Gen. Michael Lehnert and Col. Terry Carrico, both of whom preceded Respondents Hood and Cannon in their respective positions, have proclaimed that the United States may hold the detained Petitioners under these conditions indefinitely. *See, e.g.*, Roland Watson, THE TIMES (LONDON), Jan. 18, 2002 ("Donald Rumsfeld, the U.S. Defense Secretary, suggested last night that al-Qaeda prisoners could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case against them."); Lynne Sladky, ASSOC. PRESS, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held... 'We have to look at Camp X-ray as a work in progress . . .' Lehnert told CNN. Lehnert said plans are to build a more permanent prison 'exactly in accordance with federal prison standards'"); John Mintz, The WASH. Post, *Extended Detention In Cuba Mulled*, Feb. 13, 2002 ("As the Bush administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantánamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").[1]

41. According to the Department of Defense, detainees who are adjudged innocent of all charges by a military commission may nevertheless be kept in detention at Guantánamo indefinitely. *See* Department of Defense Press Background Briefing of July 3, 2003, available at http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html (last visited on July 1, 2004).

[1] *See also* TIME MAG., *Welcome to Camp X-Ray*, Feb. 3, 2002:

> More curious still is the matter of the prisoners' ultimate fate. Rumsfeld has laid out four options: a military trial, a trial in U.S. criminal courts, return to their home countries for prosecution, or continued detention 'while additional intelligence is gathered.' The last seems a distinct possibility; the Pentagon plans to build 2,000 cells at Camp X-Ray.

## IV
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF (DUE PROCESS – FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES UNLAWFUL DEPRIVATION OF LIBERTY)

42. Petitioners incorporate paragraphs 1 - 41 by reference.

43. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the Fifth Amendment to the Constitution of the United States. Respondent Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals, without Due Process of Law. Respondents Rumsfeld, Hood, and Cannon are likewise acting in violation of the Fifth Amendment, since they act at the President's direction. On its face, the Executive Order violates the Fifth Amendment.

### SECOND CLAIM FOR RELIEF (DUE PROCESS – FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES UNLAWFUL CONDITIONS OF CONFINEMENT)

44. Petitioners incorporate paragraphs 1 - 43 by reference.

45. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of the detained Petitioners to be free from arbitrary, prolonged, and indefinite detention, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States. The President's Military Order, as applied to Petitioners, violates the Fifth Amendment.

### THIRD CLAIM FOR RELIEF (DUE PROCESS – INTERNATIONAL LAW UNLAWFUL DEPRIVATION OF LIBERTY)

46. Petitioners expressly incorporate paragraphs 1 - 45 by reference.

47. By the actions described above, Respondents, acting under color of law, have violated and continue to violate customary international law, Arts. 9 and 14 of the International Covenant on Civil and Political Rights, and Arts. XXV, XXVI, XXVIII of the American Declaration on the Rights and Duties of Man. Respondent Bush has ordered the prolonged, indefinite, and

arbitrary detention of Petitioners, without legal process, in violation of binding obligations of the United States under international law. Respondents Rumsfeld, Hood, and Cannon are likewise acting in violation of international law, since they act at the President's direction. On its face, the President's Military Order violates international law.

FOURTH CLAIM FOR RELIEF
(DUE PROCESS – INTERNATIONAL LAW
UNLAWFUL CONDITIONS OF CONFINEMENT)

48. Petitioners incorporate paragraphs 1 - 47 by reference.

49. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of the detained Petitioners to be free from arbitrary, prolonged, and indefinite detention, in violation of customary international law, Arts. 9 and 14 of the International Covenant on Civil and Political Rights, and Arts. XXV, XXVI, and XXVIII of the American Declaration on the Rights and Duties of Man. The President's Military Order, as applied to the detained Petitioners, violates these and other binding obligations of the United States under International Law.

FIFTH CLAIM FOR RELIEF
(ALIEN TORT CLAIMS ACT – TORTURE)

50. Petitioners incorporate paragraphs 1 - 49 by reference.

51. The acts described herein were inflicted deliberately and intentionally for purposes of punishing and intimidating the detained Petitioners.

52. The acts described herein constitute torture in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

53. Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against the detained Petitioners.

54. Petitioners were forced to suffer severe physical and psychological abuse and agony and are entitled to monetary damages and other relief to be determined at trial.

SIXTH CLAIM FOR RELIEF
(ALIENT TORT CLAIMS ACT – CRUEL, INHUMAN OR DEGRADING TREATMENT)

55. Petitioners incorporate paragraphs 1 - 54 by reference.

56. The acts described herein had the intent and the effect of grossly humiliating and debasing the detained Petitioners, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical or moral resistance.

57. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhuman or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

58. Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhuman or degrading treatment of the detained Petitioners.

59. Petitioners were forced to suffer severe physical and psychological abuse and agony and are entitled to monetary damages and other relief to be determined at trial.

SEVENTH CLAIM FOR RELIEF
(ALIEN TORT CLAIMS ACT – ARBITRARY ARREST AND DETENTION)

60. Petitioners incorporate paragraphs 1 - 59 by reference.

61. The acts described herein constitute arbitrary arrest and detention of Petitioners in violation of the law of nations under the Alien Tort Claims Act, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

62. Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest detention of the detained Petitioners.

63. As result of Respondents' unlawful conduct, the detained Petitioners were deprived of their

freedom, separated from their families and forced to suffer severe physical and mental abuse, and are entitled to monetary damages and other relief to be determined at trial.

EIGHTH CLAIM FOR RELIEF
(DUE PROCESS – FAILURE TO COMPLY WITH U.S. MILITARY REGULATIONS AND INTERNATIONAL HUMANITARIAN LAW)

64. Petitioners incorporate paragraphs 1 - 63 by reference.

65. By the actions described above, Respondents, acting under color of law, have violated and continue to violate the rights accorded to persons seized by the United States Military in times of armed conflict, as established by, *inter alia*, the regulations of the United States Military, Articles 4 and 5 of Geneva Convention III, Geneva Convention IV, and customary international law.

NINTH CLAIM FOR RELIEF
(WAR POWERS CLAUSE)

66. Petitioners incorporate paragraphs 1 - 65 by reference.

67. By the actions described above, Respondents, acting under color of law, have exceeded the constitutional authority of the Executive and have violated and continue to violate the War Powers Clause by ordering the prolonged and indefinite detention of the detained Petitioners without Congressional authorization.

TENTH CLAIM FOR RELIEF
(SUSPENSION OF THE WRIT)

68. Petitioners incorporate paragraphs 1 - 67 by reference.

69. To the extent the Executive Order of November 13, 2001, disallows any challenge to the legality of the Petitioners' detention by way of habeas corpus, the Order and its enforcement constitute an unlawful Suspension of the Writ, in violation of Article I of the United States Constitution.

ELEVENTH CLAIM FOR RELIEF
(ARBITRARY AND UNLAWFUL DETENTION – VIOLATION OF THE APA)

70. Petitioners incorporate paragraphs 1 - 69 by reference.

71. By detaining Petitioners for the duration and in the manner described herein, Respondents have arbitrarily, unlawfully, and unconstitutionally detained the Petitioners, in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

**V.**
**PRAYER FOR RELIEF**

WHEREFORE, petitioners pray for relief as follows:

1. Grant Petitioner Jahida Sayyadi Next Friend status, as Next Friend of Bisher Al-Rawi;
2. Grant Petitioner Sabah Sunnrqrout Next Friend status, as Next Friend of Jamil El-Banna;
3. Order the detained Petitioners released from Respondents' unlawful custody;
4. Order Respondents to allow counsel to meet and confer with the detained Petitioners, in private and unmonitored attorney-client conversations;
5. Order Respondents to cease all interrogations of the detained Petitioners, direct or indirect, while this litigation is pending;
6. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of the Fifth Amendment to the United States Constitution;
7. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of the Administrative Procedures Act, 5 U.S.C. § 702;
8. Order and declare the Executive Order of November 13, 2001, unlawful as a violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;
9. Order and declare that the Executive Order of November 13, 2001, violates the War Powers Clause;
10. Order and declare that the provision of the Executive Order that bars the detained Petitioners from seeking relief in this Court is an unlawful Suspension of the Writ, in violation of Article I of the United States Constitution;

11. Order and declare that the prolonged, indefinite, and restrictive detention of Petitioners is arbitrary and unlawful, a deprivation of liberty without due process in violation of the Fifth Amendment to the United States Constitution, and in violation of the law of nations and treaties of the United States;
12. Order and declare that the detained Petitioners are being held in violation of the Fifth Amendment to the United States Constitution;
13. Order and declare that the detained Petitioners are being held in violation of customary international law, the International Covenant on Civil and Political Rights, and the American Declaration on the Rights and Duties of Man;
14. Order and declare that the detained Petitioners are being held in violation of the regulations of the United States Military, the Geneva Conventions, and international humanitarian law;
15. To the extent Respondents contest any material factual allegations in this Petition, schedule an evidentiary hearing, at which Petitioners may adduce proof in support of their allegations; and
16. Grant such other relief as the Court may deem necessary and appropriate to protect Petitioners' rights under the United States Constitution, federal statutory law, and international law.

Dated: July 2, 2004

Respectfully submitted,

Counsel for Petitioners:

George Brent Mickum IV, Bar No. 396142
Douglas J. Behr, Bar No. 163998
Keller and Heckman LLP
1001 G Street, N.W., Ste. 500W
Washington, D.C. 20001
(202) 434-4245
(202) 434-4646 (fax)

Barbara Olshansky, to be admitted *pro hac vice*
Jeffrey E. Fogel, to be admitted *pro hac vice*
Michael Ratner, to be admitted *pro hac vice*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012

Tel: (212) 614-6439
Fax: (212) 614-6499

Joseph Margulies, to be admitted *pro hac vice*
MARGULIES & RICHMAN, plc.
2520 Parke Avenue South
Minneapolis, MN 55404
Tel: (612) 872-4900
Tel: (612) 872-4967

Counsel for Petitioners

**VERIFICATION**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 2nd day of July, 2004.

George Brent Mickum IV